## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF OKLAHOMA

UNITED STATES OF AMERICA,        )
                                 )
                Plaintiff,       )
                                 )
v.                               )        Case No. CR-24-00402-JD
                                 )
ALIAS BAH DE ZA LAWRENCE         )
SOUDRY,                          )
                                 )
                Defendant.       )

## <u>ORDER</u>

Before the Court is Defendant Alias Bah De Za Lawrence Soudry's Motion to Suppress Evidence and Statements ("Motion"). [Doc. No. 28]. The United States filed a timely response [Doc. No. 29], to which Mr. Soudry replied [Doc. No. 35]. A hearing was held on May 5, 2025. *See* [Doc. No. 36]. At the hearing, Mr. Soudry personally appeared with his appointed counsel, Assistant Federal Public Defender Traci Rhone, and the United States appeared through Assistant United States Attorney Kaleigh Blackwell. The Court received the testimony of two witnesses. The United States called Oklahoma Highway Patrol Trooper Lisa Jorgensen, and the defense called Mr. Soudry's uncle, Elroy Pappan. The United States submitted as evidence a Blood Test Officer's Affidavit, which it had previously attached as an exhibit to its response brief. [Doc. No. 29-1]. Upon consideration of the filings, evidence, and arguments presented, and having reviewed the relevant law, the Court denies the Motion.

I.    **BACKGROUND AND PROCEDURAL HISTORY**[1]

Mr. Soudry is charged in a one-count indictment with involuntary manslaughter in violation of 18 U.S.C. §§ 1112(a) and 1153. [Doc. No. 1]. This charge arises out of a fatal collision on State Highway 76 on the afternoon of June 14, 2024; Mr. Soudry allegedly caused the collision while driving under the influence of alcohol and marijuana.

After the collision, Mr. Soudry was taken by ambulance to Integris Southwest Medical Center in Oklahoma City. There, Oklahoma State Trooper and trained Drug Recognition Expert ("DRE") Lisa Jorgensen evaluated Mr. Soudry while he received medical care. Trooper Jorgensen asked Mr. Soudry questions about the collision and the events leading up to it without reading Mr. Soudry the *Miranda* warnings, and Mr. Soudry told her that he had consumed alcohol and smoked marijuana earlier that morning. Trooper Jorgensen then asked if Mr. Soudry would consent to a blood draw, and he consented, both verbally and by signing a Blood Test Officer's Affidavit. A nurse at the hospital drew Mr. Soudry's blood, which was later tested by the Oklahoma State Bureau of Investigation.

After the blood draw, Trooper Jorgensen performed a partial DRE evaluation. Trooper Jorgensen read Mr. Soudry his *Miranda* rights, and he indicated he understood and agreed to speak with her. Trooper Jorgensen then conducted a personal breath test,

---

[1] This overview draws from the parties' briefs and the record to provide a factual background underlying the issues raised in the Motion. Because the parties did not present evidence or testimony regarding the events prior to Mr. Soudry's hospitalization—such as by submitting police reports from the scene of the collision—the Court makes no findings of fact regarding any events preceding Trooper Jorgensen's arrival at Integris Southwest Medical Center.

eye tests (including horizontal and vertical gaze nystagmus tests), and a modified

Romberg test for him to estimate the passage of thirty seconds. After performing these

tests, Trooper Jorgensen then questioned Mr. Soudry further. Mr. Soudry repeated his

prior statements about drinking and smoking earlier that morning. Based on the results of

the evaluation, she opined that Mr. Soudry was under the influence of alcohol and unable

to operate a vehicle. Trooper Jorgensen placed him under arrest. While under arrest, Mr.

Soudry called his uncle, Elroy Pappan, and allegedly made incriminating statements to

him while Trooper Jorgensen listened.

The Motion seeks to suppress all statements Mr. Soudry made to Trooper

Jorgensen—both before and after she read him the *Miranda* warnings—as well as the

statements he made to his uncle. Mr. Soudry argues that his statements were elicited in

violation of *Miranda v. Arizona*, 384 U.S. 436 (1966), and its progeny. Mr. Soudry also

moves to suppress the results of the blood test. Mr. Soudry concedes that he consented to

the blood draw, but he argues that his consent was not freely and voluntarily given.

Accordingly, he argues, the consent exception to the Fourth Amendment does not apply,

and the blood draw was an unconstitutional warrantless search.

## II.    LEGAL STANDARDS

The purpose of a suppression hearing is "to determine preliminarily the

admissibility of certain evidence allegedly obtained in violation of defendant's rights

under the Fourth and Fifth Amendments." *United States v. Merritt*, 695 F.2d 1263, 1269

(10th Cir. 1982). "[T]he controlling burden of proof at suppression hearings should

impose no greater burden than proof by a preponderance of the evidence." *United States*

*v. Matlock*, 415 U.S. 164, 177 n.14 (1974). The party bearing the burden depends on the nature of the constitutional challenge. When the government relies on consent as an exception to the Fourth Amendment's warrant requirement, "[t]he government bears the burden of proving that consent is given freely and voluntarily." *United States v. Harrison*, 639 F.3d 1273, 1278 (10th Cir. 2011). In contrast, when a defendant moves to suppress statements because they were elicited in violation of *Miranda*, "[t]he defendant bears the initial burden of establishing they were subject to custodial interrogation." *United States v. Martinez*, 122 F.4th 389, 405 (10th Cir. 2024). "Once the defendant establishes a prima facie case of custodial interrogation, the burden shifts to the Government to establish by a preponderance of the evidence that any waiver of the defendant's Fifth Amendment privilege comported with the requirements of *Miranda* and its progeny." *Id.*

## III.   ANALYSIS

### A.   Mr. Soudry's statements were not elicited in violation of *Miranda*.

Mr. Soudry seeks to suppress three categories of statements: the statements he made to Trooper Jorgensen before she read Mr. Soudry the *Miranda* warnings; Mr. Soudry's statements to Trooper Jorgensen after she read him his *Miranda* rights; and the statements he made while on the phone with his uncle, Mr. Pappan. According to Mr. Soudry, his first set of statements to Trooper Jorgensen must be suppressed because Trooper Jorgensen elicited these statements during a custodial interrogation without reading Mr. Soudry the *Miranda* warnings. Mr. Soudry asks the Court to suppress the second set of statements, even though Trooper Jorgensen had read Mr. Soudry his *Miranda* rights before he gave those statements, because reading the *Miranda* warnings

4

at that point did not cure the taint of the original constitutional violation. Mr. Soudry argues that the third set of statements, which he made to his uncle, should be suppressed because Trooper Jorgensen was listening to the phone conversation and did not give Mr. Soudry an opportunity to speak to his uncle privately.

The Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 478 (1966), the Supreme Court held that "when an individual is taken into custody or otherwise deprived of his freedom by the authorities in any significant way and is subjected to questioning, the privilege against self-incrimination is jeopardized." Therefore, "the prosecution may not use statements, whether exculpatory or inculpatory, stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Id.* at 444. These procedural safeguards have become known as "*Miranda* warnings."

Officers need not read *Miranda* warnings to every person they question; the *Miranda* decision makes clear that it applies only to "custodial interrogation[s]." *Id.* For *Miranda* purposes, "'custody' is a term of art that specifies circumstances that are thought generally to present a serious danger of coercion." *Howes v. Fields*, 565 U.S. 499, 508–09 (2012). When determining if a person was in custody for *Miranda* purposes, "the initial step is to ascertain whether, in light of 'the objective circumstances of the interrogation,' a 'reasonable person [would] have felt he or she was not at liberty to terminate the interrogation and leave.'" *Id.* at 509 (alteration in original) (citations

5

omitted). The Court "must examine 'all of the circumstances surrounding the interrogation'" when making this determination, including "the location of the questioning, its duration, statements made during the interview, the presence or absence of physical restraints during the questioning, and the release of the interviewee at the end of the questioning." *Id.* (citations omitted). Because this inquiry is an objective one, "the subjective views harbored by either the interrogating officers or the person being questioned" have no bearing on the custody determination. *Stansbury v. California*, 511 U.S. 318, 323 (1994). Instead, "the only relevant inquiry is how a reasonable man in the suspect's position would have understood his situation." *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984).

With that said, "[n]ot all restraints on freedom of movement amount to custody for purposes of *Miranda*." *Fields*, 565 U.S. at 509. Thus, even if an interviewee's freedom of movement was restricted, the Court must "ask[] the additional question whether the relevant environment presents the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Id.*; *see also Maryland v. Shatzer*, 559 U.S. 98, 112 (2010) ("[T]he freedom-of-movement test identifies only a necessary and not a sufficient condition for *Miranda* custody.").

In *United States v. Berres*, 777 F.3d 1083, 1093 (10th Cir. 2015), the Tenth Circuit determined that a defendant was not in custody when officers interviewed him at a hospital. In that case, the defendant entered a business with a bag full of firearms, ammunition, and explosives equipment, and he asked the employees to call an ambulance to take him to the Veterans Administration hospital. *Id.* at 1086. After the defendant was

taken to the hospital, three plainclothes officers arrived to interview him. *Id.* The Tenth Circuit reasoned that certain aspects of the officers' encounter with the defendant weighed in favor of concluding that the defendant was in custody. *Id.* at 1092. Specifically, the officers did not tell the defendant that he was free to leave, and their questioning related to a potential crime committed by the defendant. *Id.*

However, the *Berres* court concluded that the totality of the circumstances indicated that the defendant was not in custody during the questioning. *Id.* The defendant was at the hospital on his own request. *Id.* The officers never told the defendant that he was in custody, and they did not physically restrain him in any way. *Id.* The defendant "appeared calm, was completely willing to discuss the contents of his bag, and never sought to end the interview." *Id.* The officer interviewing the defendant "was not aggressive or confrontational during his questioning, which lasted about an hour." *Id.* The court determined that the atmosphere in the hospital was not "police-dominated" because although three officers reported to the hospital, only one was in the room interviewing the defendant "for the vast majority of the interview." *Id.* All three officers were in plain clothes, they did not have their weapons displayed, and the interviewing officer "came and went from the room, as did hospital staff on at least one occasion." *Id.* In addition, the defendant "was seated nearer to the room's open door" than the officer. *Id.* In light of these facts, the Tenth Circuit affirmed the district court's ruling that the defendant was not in custody for *Miranda* purposes during the interview. *Id.* at 1093; *see also United States v. Robertson*, 19 F.3d 1318, 1320–21 (10th Cir. 1994) (concluding a defendant was

not in custody when FBI agents questioned him in the hospital while he was recuperating from a serious head injury).

A majority of the federal courts of appeals have been presented with similar factual circumstances in which officers interviewed a defendant in the hospital, and nearly all of these courts have held that the defendant was not in custody for purposes of *Miranda*.[2] One such case, *United States v. Wiggins*, 708 F. App'x 105 (4th Cir. 2017) (unpublished), presents factual similarities to the case at bar, and the Court finds it persuasive. In *Wiggins*, the defendant was involved in a car accident that resulted in two fatalities, and officers questioned the defendant in the hospital while he was being treated for injuries he sustained in the accident. *Id.* at 108. Considering the totality of the circumstances, the Fourth Circuit determined that "almost none of the coercive factors that have previously led us to determine that an individual is 'in custody' were present during [the defendant's] questioning." *Id.* There were only two officers in the room with the defendant, and medical staff "continually entered and exited the room during the interview." *Id.* The officers never told the defendant that he was under arrest, they never physically restrained or handcuffed him, and they only physically touched the defendant

---

[2] *United States v. Infante*, 701 F.3d 386, 396–98 (1st Cir. 2012), *modified*, *Hill v. Walsh*, 884 F.3d 16 (1st Cir. 2018); *Gren v. Greiner*, 89 F. App'x 754, 756–57 (2d Cir. 2004) (unpublished); *United States v. Jamison*, 509 F.3d 623, 628–32 (4th Cir. 2007); *Stechauner v. Smith*, 852 F.3d 708, 715–16 (7th Cir. 2017); *United States v. New*, 491 F.3d 369, 373–74 (8th Cir. 2007); *United States v. Martin*, 781 F.2d 671, 673 (9th Cir. 1985). *But see United States v. Hallford*, 756 F. App'x 1, 6–8 (D.C. Cir. 2018) (unpublished) (holding that a district court did not commit clear error by concluding that the defendant was in custody while being interviewed at a hospital by Secret Service agents).

once, "after they obtained the challenged statements, in order to comfort [the defendant] when he discovered his wife died in the accident." *Id.* The officers never brandished their weapons, and there was no evidence suggesting they ever "adopted an aggressive or authoritative tone or demeanor." *Id.* The defendant "never asked the police officers to leave or to stop questioning him." *Id.* "Under these circumstances," the court concluded, "a reasonable person in [the defendant's] circumstances would have felt free to terminate the police questioning, and [the defendant] therefore was not in custody for purposes of the Fifth Amendment." *Id.*

The Court finds that this case presents several factual similarities to *Berres* and *Wiggins*, and these factors weigh against concluding that Mr. Soudry was in custody. Trooper Jorgensen interviewed Mr. Soudry in his hospital room while he was lying in the hospital bed receiving treatment from medical staff. The location of the questioning was not as familiar and comfortable to Mr. Soudry as, say, his home, but it was also not as foreign and police-dominated as a stationhouse interrogation room. In other words, the hospital room "was at least a neutral setting." *United States v. Infante*, 701 F.3d 386, 397 (1st Cir. 2012), *modified*, *Hill v. Walsh*, 884 F.3d 16 (1st Cir. 2018). Medical staff came and went from the room during the interview, and Trooper Jorgensen "worked around" them so as not to impede Mr. Soudry's medical care. Trooper Jorgensen was the only officer on the scene, and although she was in uniform wearing her visible service weapon, there was no evidence offered that she brandished the weapon or removed it.

The nature and duration of the interview suggest that it was non-custodial. The interview was relatively brief, lasting for approximately twenty minutes. The interview

took place in the mid-afternoon, around 2:30 p.m., "as opposed to a time that might have appeared more menacing." *Infante*, 701 F.3d at 398. Trooper Jorgensen maintained a conversational, professional tone throughout the interview. She was not aggressive or confrontational while questioning Mr. Soudry. During the interview, Trooper Jorgensen never told Mr. Soudry that he was in custody or that he was not free to leave, and he was never handcuffed or otherwise physically restrained. Trooper Jorgensen never touched Mr. Soudry before placing him under arrest after the interview had concluded.

Trooper Jorgensen's line of questioning was not coercive. She testified that she was "just trying to get to the bottom of what had happened," and her questions to Mr. Soudry about the collision and the events leading up to it reflect that intent. After identifying herself, asking Mr. Soudry if he was in pain, and asking him to provide his name and date of birth, Trooper Jorgensen asked Mr. Soudry about the collision and the events leading up to it. Mr. Soudry explained that when he collided with the other vehicle, he had been trying to turn onto "Reno," although he could not recall the road on which he had been driving. Mr. Soudry told Trooper Jorgensen that, while working at Walmart the night before, he had consumed alcohol around 4:00 a.m. He later smoked marijuana after getting off work sometime between 6:00 and 7:30 a.m. Trooper Jorgensen's questions to Mr. Soudry were clear and straightforward; she never employed trickery or any deceptive tactics. Mr. Soudry cooperated with Trooper Jorgensen throughout the interview. He answered all of Trooper Jorgensen's questions and never attempted to end the interview.

10

To be sure, some factors weigh in favor of finding that Mr. Soudry was in custody. Trooper Jorgensen testified that her questioning was purely investigative and she was not interrogating Mr. Soudry as a suspect, but, ultimately, her line of questioning related to a potential crime committed by Mr. Soudry. Although Trooper Jorgensen never told Mr. Soudry he was under arrest or in custody, she never said that he was *not* in custody or that he was free to end their conversation. In fact, Trooper Jorgensen testified that from her perspective Mr. Soudry was *not* free to leave. Trooper Jorgensen testified that Mr. Soudry was in "investigative detention" while she questioned him about the accident, so he was not free to leave and she would have prevented him from getting out of the hospital bed had he attempted to do so.

These facts, however, are not dispositive. Determining whether an interviewee was in custody is a purely objective analysis. An officer's subjective views about the nature of an interrogation are relevant "only if the officer's views or beliefs were somehow manifested to the individual under interrogation and would have affected how a reasonable person in that position would perceive his or her freedom to leave." *Stansbury v. California*, 511 U.S. 318, 325 (1994). For example, in *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984), a state trooper "apparently decided as soon as [the defendant] stepped out of his car that [the defendant] would be taken into custody and charged with a traffic offense," but because the trooper "never communicated his intention" to the defendant, the Supreme Court held that the trooper's "unarticulated plan has no bearing on the question whether a suspect was 'in custody' at a particular time." Thus, even though it was Trooper Jorgensen's understanding that Mr. Soudry was not free to leave, she never

11

communicated that belief to Mr. Soudry, so her subjective belief is not relevant to this objective inquiry.

Mr. Soudry argues that his mental condition rendered the interview coercive. Mr. Soudry was nineteen years old, and he had no prior encounters with the police or the criminal justice system. Trooper Jorgensen observed that Mr. Soudry had a superficial head wound from the car crash. When she asked him if he was in pain, he complained only that his hips hurt; he never complained about his head. In light of his condition, Mr. Soudry argues, "[a] reasonable person in his situation would not believe he was free to terminate the police encounter or leave as he was still being treated." [Doc. No. 35 at 5]. However, "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Colorado v. Connelly*, 479 U.S. 157, 170 (1986). There is no evidence to indicate that Trooper Jorgensen somehow overreached and coerced Mr. Soudry based on a uniquely vulnerable mental condition she knew he possessed. *See United States v. Robertson*, 19 F.3d 1318, 1321 (10th Cir. 1994). Government coercion is the touchstone of the *Miranda* custody inquiry, and Mr. Soudry's potentially vulnerable state of mind does not impact that inquiry.

Considering the totality of the circumstances, a reasonable person in Mr. Soudry's position would have felt free to refuse Trooper Jorgensen's questioning and terminate the interview. Moreover, the environment of this interview did not present "the same inherently coercive pressures as the type of station house questioning at issue in *Miranda*." *Fields*, 565 U.S. at 509. Rather, Trooper Jorgensen was the only officer interviewing Mr. Soudry, and medical staff were in and out of the hospital room during

the interaction. Thus, Mr. Soudry was not in custody for *Miranda* purposes, and Trooper Jorgensen was not required to read him his *Miranda* warnings. The Court denies the Motion to the extent it seeks to suppress Mr. Soudry's un-*Mirandized* statements.

As for the second set of statements Mr. Soudry provided after receiving the *Miranda* warnings, Mr. Soudry's arguments are unavailing. Because there was no constitutional violation with respect to the first set of statements, his *Mirandized* statements were not "tainted" by his earlier, non-*Mirandized* statements. *See United States v. Guillen*, 995 F.3d 1095, 1121 (10th Cir. 2021) ("In sum, the standard for assessing the admissibility of confessions given subsequent to midstream *Miranda* warnings can be applied using a straightforward analysis: First, was the initial self-incriminating statement, though voluntary, obtained in violation of the defendant's *Miranda* rights? If not, there is no need to go further."). The Court denies the Motion to the extent it seeks to suppress Mr. Soudry's statements to Trooper Jorgensen after she read him his *Miranda* rights.

Lastly, there is no basis to suppress Mr. Soudry's statements to his uncle, Mr. Pappan. Again, "[t]he sole concern of the Fifth Amendment, on which *Miranda* was based, is governmental coercion." *Connelly*, 479 U.S. at 170. Mr. Soudry's statements to his uncle in no way implicate governmental coercion. His uncle was not working with the government in any capacity, and Trooper Jorgensen did not coerce Mr. Soudry to say anything to his uncle. Neither the Constitution nor *Miranda* required Trooper Jorgensen to give Mr. Soudry the opportunity to speak to his uncle in private. Because Mr. Soudry's

statements to his uncle do not implicate *Miranda*, the Motion is denied to the extent it seeks to suppress those statements.

In sum, although Trooper Jorgensen initially did not read Mr. Soudry his *Miranda* rights, he was not in custody, so *Miranda* did not apply. Because Mr. Soudry's initial statements were not elicited in violation of *Miranda*, they did not taint his later, *Mirandized* statements to Trooper Jorgensen. Likewise, Mr. Soudry's statements to his uncle did not implicate *Miranda*, so there is no basis for suppressing those statements. For these reasons, the Court denies the Motion to the extent it seeks to suppress any of Mr. Soudry's statements.

### B.    Mr. Soudry voluntarily consented to the blood test.

Mr. Soudry moves to suppress the results of the warrantless blood test Trooper Jorgensen conducted while Mr. Soudry was in the hospital. Mr. Soudry concedes that he consented to the blood draw. Motion at 8 ("Mr. Soudry consented to the blood draw."). However, he argues that his consent was not freely and voluntarily given, so the consent exception to the Fourth Amendment does not apply and the blood draw was an unconstitutional warrantless search.

The Fourth Amendment prohibits unreasonable searches and seizures, and the Supreme Court has established that "the taking of a blood sample or the administration of a breath test is a search." *Birchfield v. North Dakota*, 579 U.S. 438, 455 (2016). Thus, as is the case with other searches, a warrantless blood draw is presumptively unreasonable unless it falls within a recognized exception to the Fourth Amendment. *See Missouri v.*

*McNeely*, 569 U.S. 141, 148 (2013). In this case, the government relies on one such exception: Mr. Soudry's consent to the warrantless blood draw.

"The [consent] exception applies when the government proves (1) the officers received either express or implied consent and (2) that consent was freely and voluntarily given." *Guillen*, 995 F.3d at 1103. Because Mr. Soudry concedes that he consented to the blood draw, the second prong—whether his consent was freely and voluntarily given—is the only disputed issue.

Whether consent was given voluntarily is a factual determination that depends on "the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation." *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973). The Supreme Court and Tenth Circuit have instructed district courts to consider a variety of factors when conducting this inquiry. Regarding the characteristics of the accused, courts should consider "the physical and mental condition and capacity of the defendant," *United States v. Sawyer*, 441 F.3d 890, 895 (10th Cir. 2006), which might include "the youth of the accused, his lack of education, or his low intelligence." *Schneckloth*, 412 U.S. at 226 (citations omitted). As for the details of the questioning, "the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep" are all factors that can suggest consent was not given voluntarily. *Id.* (citations omitted); *see also Sawyer*, 441 F.3d at 895 ("Whether an officer reads a defendant his *Miranda* rights, obtains consent pursuant to a claim of lawful authority, or informs a defendant of his or her right to refuse consent also are

15

factors to consider . . . ." (citations omitted)). Police conduct is also relevant. An officer's "use of violence, threats, promises, inducements, deception, trickery, or an aggressive tone" can show consent was not voluntarily given, and "the number of officers on the scene[] and the display of police weapons" are also relevant considerations. *Sawyer*, 441 F.3d at 895.

Here, after questioning Mr. Soudry for almost twenty minutes, Trooper Jorgensen informed Mr. Soudry that the driver of one of the vehicles involved in the collision had died. She then asked Mr. Soudry if he would consent to a blood draw, and he verbally consented at 2:39 p.m. Trooper Jorgensen opened a blood kit, which contains a Blood Test Officer's Affidavit, and she began filling out the affidavit. At some point between the time when Mr. Soudry gave his verbal consent and when Nurse Caleb Griffin drew his blood, Trooper Jorgensen explained the form to Mr. Soudry and watched him sign his name next to a checked box that states: "I HAVE AUTHORIZED BLOOD WITHDRAWAL." Nurse Griffin first attempted to draw Mr. Soudry's blood at 2:46 p.m., but he was unsuccessful. Trooper Jorgensen exited the building, retrieved a second blood kit from her vehicle, and returned to Mr. Soudry's hospital room. Nurse Griffin then successfully drew Mr. Soudry's blood at 2:52 p.m.

Looking, then, to the details of the questioning, these circumstances indicate that Mr. Soudry's consent was voluntarily given. First and foremost, Mr. Soudry confirmed his verbal consent by signing a written consent form, which is a strong indicator of voluntary consent. *See United States v. Warwick*, 928 F.3d 939, 945 (10th Cir. 2019). The length of the questioning leading up to Mr. Soudry giving his consent—approximately

twenty minutes—was relatively short, as was the approximately thirteen-minute span from the time Mr. Soudry gave his verbal consent to the time of the successful blood draw. Trooper Jorgensen did not repeatedly badger Mr. Soudry until he eventually relented; rather, she asked for his consent a single time, and he immediately consented. Mr. Soudry was not handcuffed or physically restrained, and Trooper Jorgensen did not touch him. In short, "[t]his was not the equivalent of a lengthy interrogation in a bare room while the subject sits on a stool until [his] will is overborne." *United States v. Cruz-Mendez*, 467 F.3d 1260, 1267 (10th Cir. 2006).

The environment in which Mr. Soudry provided his consent to the blood test was not police-dominated, and Trooper Jorgensen did not employ inappropriate tactics to elicit his consent. Trooper Jorgensen never threatened Mr. Soudry, used deception or trickery, or made any promises or inducements to coerce his consent. Her tone was professional and conversational, not aggressive or confrontational. Trooper Jorgensen was in uniform and had a visible firearm, but she was the only officer questioning Mr. Soudry. Significantly, Trooper Jorgensen left the building for several minutes after Mr. Soudry provided his verbal consent. During this time when Trooper Jorgensen was retrieving the second blood kit from her vehicle, no officer was in the room with Mr. Soudry. Yet, Mr. Soudry never attempted to revoke his consent. A reasonable person in Mr. Soudry's position would have felt free to revoke his consent. Indeed, Trooper Jorgensen testified that in the past, she has received verbal consent from individuals who then refused to sign the Blood Test Officer's Affidavit; in such circumstances, she

testified that she does not take that individual's blood. In contrast, once Mr. Soudry consented, he never attempted to revoke his consent.

Not all aspects of Trooper Jorgensen's questioning weigh in favor of finding that Mr. Soudry's consent was voluntary. Trooper Jorgensen did not read Mr. Soudry his *Miranda* rights before interviewing him or asking for his consent to the blood draw, and she did not tell him that he had the right to refuse. *See United States v. Harrison*, 639 F.3d 1273, 1279 (10th Cir. 2011) ("Although government agents are not required to advise a defendant that he or she has a right to refuse consent to search, this is one factor considered in the totality of circumstances."). Nevertheless, considering all of the details of the interview, these facts do not outweigh the factors indicating that Mr. Soudry's consent was freely and voluntarily given.

Turning to the physical and mental characteristics of Mr. Soudry, he was nineteen years of age. He had no criminal history or prior experience with the police. Mr. Soudry was lying in bed, and Trooper Jorgensen observed that he had a head wound. When she asked if he was in pain, Mr. Soudry did not complain that his head hurt, and medical staff had left the wound uncovered. Mr. Soudry was able to respond to all of Trooper Jorgensen's questions. He was able to provide and spell his name and tell Trooper Jorgensen his date of birth. His speech was "fairly normal," he was not mispronouncing or slurring his words, and he never lost consciousness. Trooper Jorgensen reported that there were "gaps" in Mr. Soudry's memory, but he was able to recall that at the time of the accident he had been turning onto "Reno" (although he could not remember the road he was turning off of). During his interview with Trooper Jorgensen, Mr. Soudry

admitted to consuming alcohol and smoking marijuana earlier that morning. Trooper Jorgensen later conducted a DRE examination on Mr. Soudry, and she opined based on the results of that examination that he was impaired by alcohol.

Mr. Soudry had the mental capacity to provide knowing and voluntary consent to the blood test. To be sure, some factors weigh in favor of a contrary conclusion. Mr. Soudry was impaired by alcohol and marijuana, he had a head injury, and he was nineteen years old with no prior experience with law enforcement. Nevertheless, the totality of the circumstances indicates that he had the capacity to consent. Mr. Soudry was rather young and inexperienced, but he had reached the age of majority and was a legal adult who could understand the situation he faced. *Cf. United States v. Guillen*, 995 F.3d 1095, 1105 (10th Cir. 2021) ("It is true that the agents did not inform Ethan he could refuse their request to enter the house and that Ethan lacked prior experience with law enforcement. But Ethan was a legal adult who knew enough about his rights to ask the agents if they had a warrant to enter his home."). Mr. Soudry's responses to Trooper Jorgensen's questions indicate that he had the capacity to understand what she was saying and provide cogent answers. He knew who she was and what she was doing at the hospital. Mr. Soudry could spell his name, and he could recount where he was at the time of the accident and what he had been doing leading up to the collision. The evidence shows that Mr. Soudry had the wherewithal to understand what was being asked of him and respond appropriately. Thus, based on the evidence presented, the Court concludes that Mr. Soudry had the mental capacity to provide voluntary consent to the blood draw.

Considering the totality of the circumstances, Mr. Soudry's consent to the blood draw was unequivocal and specific, freely and intelligently given, and not the product of duress or coercion. Because Mr. Soudry voluntarily consented to the blood draw, the motion to suppress the results of the blood test is denied.

## IV.  **CONCLUSION**

For these reasons, the Court **DENIES** in full Defendant Alias Bah De Za Lawrence Soudry's Motion to Suppress Evidence and Statements [Doc. No. 28].

IT IS SO ORDERED this 16th day of May 2025.

JODI W. DISHMAN
UNITED STATES DISTRICT JUDGE